481 So.2d 272 (1985)
Lexie HOWARD
v.
Haven CLANTON.
No. 55023.
Supreme Court of Mississippi.
November 27, 1985.
Rehearing Denied January 29, 1986.
*273 Jay Gore, Jr., Gore, Gore & Purdie, Grenada, for appellant.
Ottis B. Crocker, Jr., Bruce, for appellee.
En Banc.
SULLIVAN, Justice, for the Court:
The Chancery Court of Calhoun County, Mississippi, entered a judgment for the appellee in an action by the appellant on a complaint on warranty arising out of transfer of property, and adjudicated that the appellant LEXIE HOWARD was not entitled to recover from the appellee HAVEN CLANTON attorney's fees of $2,414.30 incurred in a prior action to remove clouds from the title, and denying Howard recovery of certain interest on escrow funds.
There are five assignments of error:
I. Failure to adjudicate that the chain of title to Clanton was such that curative work was required before it was marketable;
II. Taking judicial notice that the $20,000 purchase price was in an escrow fund bearing interest;
III. In the interruption of cross-examination of Clanton by Howard's attorney and in permitting Clanton's attorney to confer privately with Clanton while in the midst of cross-examination;
IV. In finding that attorney's fees were not allowable when incurred to correct a defective title;
V. In failing to find that the attorney's fees incurred by Howard in the Grenada County Chancery Court were reasonable.
The tract in question is 40 acres of land located in the Southeast Quarter of the Northwest Quarter of Section 10, Township 21 North, Range 7 East, in Grenada County, Mississippi. It is necessary to review the history of this 40 acres.
In 1936 the land was patented out of the United States Government to Gladys Ash, and that same year Ash conveyed by warranty deed to one F.C. Gallaher. Gallaher conveyed by warranty deed to Boyce Clanton. Taxes, however, were not paid on the 40 acres while assessed to Gallaher and it was sold for taxes to the state of Mississippi. The property again sold for taxes in the early 1940's while assessed to Boyce Clanton, and was sold to D. Seward. On April 25, 1945, by quitclaim deed, D. Seward conveyed the property to Clayton Carpenter.
Notwithstanding that Clanton had thus seemingly been divested of his interest in the property, on September 10, 1946, the state of Mississippi executed a forfeited tax land patent conveying the 40 acres to Boyce Clanton. Unfortunately, this tax land patent erroneously described the 40 acres as lying in Section 11. Sometime thereafter, the state of Mississippi executed a corrected forfeited tax land patent to Boyce Clanton, which was never recorded.
On June 17, 1952, Boyce Clanton conveyed the land to Clayton Carpenter, by warranty deed recorded in Land Deed Book 101 at Page 553. Clayton Carpenter thus had title under deeds both from D. Seward and from Boyce Clanton, and, it would seem, possessed the fee.
Haven Clanton became interested in the land in 1974. He went to the Grenada County Court House to check the title and came to the conclusion that the state of Mississippi had acquired title to the land in 1955 because of non-payment of taxes. The land records indicate that for advalorem tax purposes the 40 acres was assessed to Clayton Carpenter from 1951 through 1954, and to the state of Mississippi from 1955 through 1974. However, there is no record of any tax sale in 1955 to the state of Mississippi. The record indicates that the last tax sale at which the *274 state of Mississippi was the purchaser was in 1938, and that the state had conveyed the property by forfeited tax land patent to Boyce Clanton, which patent contained an erroneous description. The state had corrected the description in a corrected forfeited tax land patent to Boyce Clanton, which patent was never recorded. The state was without title in 1955.
Haven Clanton then employed Sam Waits to obtain for Clanton title from the state of Mississippi. Both Waits and Clanton contacted Watt Carter, then the Land Commissioner for the state of Mississippi. In June of 1974, Carter informed Waits that the state "apparently" owned the land since a particular land patent number 58,364 granted to Boyce Clanton was never recorded within the statutory time period. The letter also revealed that the Chancery Clerk of Grenada County was notified of the patent in 1952 but that the required certificate and original patent were never received by the state land office. Clanton then put in his application to purchase the land from the state on June 13. Carter subsequently informed Waits that the widow of Boyce Clanton would have priority to purchase the land because of patent number 58,364 issued to Boyce Clanton. After further research, Waits found that Boyce Clanton had conveyed his interest in the property to Clayton Carpenter in 1952. Carter then notified Waits that if the land sold for the 1955 taxes there would be no need to cancel patent number 58,364, which had never been recorded, if the Grenada County Chancery Clerk would certify the sale to the state.
However, Waits informed Carter that it seemed that the property sold for taxes in 1939, rather than in 1955. It was on this state of affairs that on October 25, 1974, Clanton's application for the purchase of the land was approved, and a forfeited tax land patent was issued to him on October 22, 1974.
In the spring of 1975, Clanton had heard that Howard might be interested in purchasing the property. Clanton went to Howard's place of business and informed him that the purchase price was $6,000.00. Howard agreed to purchase the property and told Clanton to have Waits prepare a deed and hold it until he paid the money to Waits. Howard finally paid Waits and received a warranty deed to the 40 acres on May 5, 1975.
Howard held the property until August 24, 1981, when he conveyed it by warranty deed to Donald Sultan for $20,000. Prior to this conveyance, Sultan requested a title opinion from Howard and Howard's attorney researched the chain of title and found the defect. The defect was a break in the chain of title since it appeared that the state had acquired title. There was no reference, however, to any tax sale involving Clayton Carpenter, who had acquired the land from D. Seward and Boyce Clanton. Therefore, he declined to certify the title. Jay Gore, Jr., who was Howard's attorney, then consulted with Waits and neither could determine exactly how the state had gained title to the property. Gore then spoke directly with Clanton but still could not determine how the state had acquired title.
Gore subsequently wrote a letter to Clayton Carpenter's heirs attempting to obtain quitclaim deeds from them. This being unsuccessful, suit was filed by Lexie Howard in the Chancery Court of Grenada County against Clayton Carpenter's heirs. This suit was filed on January 21, 1982, and sought removal from the title of the clouds created by the claims of the Carpenter heirs. On February 4, 1982, Howard notified Clanton that the expenses of the suit would fall on Clanton's shoulders and Clanton was invited to employ his attorney and participate in the suit in order to minimize the cost. This was not done.
Sultan was substituted as a complainant in the Grenada County proceedings by agreement of the parties, since Howard had conveyed the property to Sultan in August of 1981. However, the purchase price of $20,000 was not paid to Howard at that time but was withheld by Sultan. The Carpenter heirs answered the suit and filed a cross-claim seeking to cancel as a cloud *275 upon their title the Howard/Sultan deeds and to evict Sultan from the property.
After a full trial, the Grenada County Chancery Court found title to be vested in Sultan through the warranty deed executed by Howard. Howard then instituted this suit in the Chancery Court of Calhoun County against Clanton on the theory that just as Howard had been obliged to defend his warranty to Sultan in Grenada County so Clanton was obliged on his warranty to Howard to reimburse Howard for the $2,414.30 expense from the Grenada County proceeding and for interest on the $20,000 purchase price from August 24, 1981, that Howard had lost as a result of the defect in the title.
It was this action that met with defeat and led to this appeal.

I.

WHETHER CURATIVE WORK WAS REQUIRED BEFORE THE TITLE TO THE LAND BECAME MARKETABLE, AND IF SO MAY ATTORNEY'S FEES BE AWARDED AS A MEASURE OF DAMAGES
The lower court found that the suit to confirm title was not necessary, since a breach of the warranty of title had not occurred. In fact, a breach of the warranty of title did not occur for this covenant is broken only by eviction or the equivalent of eviction. See Bridges v. Heimburger, 360 So.2d 929 (Miss. 1978); Green v. Irving, 54 Miss. 450 (1877); Brunt v. McLaurin, 178 Miss. 86, 172 So. 309 (1937). However, as will be seen, this is not determinative of the issue for the covenants of seizin and of power to sell were breached.
Mississippi Code Annotated § 89-1-33 (1972) provides that, "The word `warrant' without restrictive words in a conveyance shall have the effect of embracing all of the five covenants known to common law, to wit: seizin, power to sell, freedom from incumbrance, quiet enjoyment and warranty of title."
It is uncontested that Clanton conveyed the 40 acres to Howard by warranty deed. By this act, Clanton was brought within the confines of § 89-1-33.
Therefore, a brief discussion of the five covenants is deserving. The most basic distinction between the covenants is that some run with the land, while others are merely personal. The effect of a covenant running with the land is that remote grantors may be liable for their breach. Conversely, the covenants characterized as personal are breached, if at all, at the moment of conveyance. Thus, personal covenants bind only the covenantor and, if breached, may only be taken advantage of by the immediate covenantee.
The covenant of freedom from encumbrance is a guarantee to the grantee that the property is not subject to any rights or interests that would diminish the value of the land. (Examples being mortgages, liens and easements). In Mississippi this covenant is generally held to run with the land, being closely compared to the warranty of title. Simon v. Williams, 140 Miss. 854, 105 So. 487 (1925).
The covenants of quiet enjoyment and warranty of title are held to run with the land, and as such may be taken advantage of by a remote grantee. However, as seen above, these are only broken by eviction or the equivalent thereof. Bridges v. Heimburger, supra.
The covenants of seizin and power to sell (right to convey) are personal covenants, and as such the immediate covenantor may only be charged with the breach thereof.
As stated in Green v. Irving, supra, when dealing with the covenants of seizin and power to sell, "these latter covenants are personal, in presenti, and do not run with the land. They are broken as soon as made, if the covenantor is not seized according to their stipulations; and suit may be at once instituted for their breach." 54 Miss. at 458; See also Bridges v. Heimburger, supra.
As stated in 20 Am.Jur.2d Covenants § 75 (1965),

*276 The term "seisin" as used in a covenant is generally construed to mean that the grantor is seised of the legal title. Under this rule, a covenant of seisin is regarded as a guaranty against any title existing in a third person, and which might defeat the estate granted, and it does not embrace a title that may already be in the grantee. While the covenant of seisin is regarded in legal effect as a covenant of title as well as a covenant of possession, mere possession of the property is not sufficient, under this doctrine, to satisfy the covenant; the covenant is deemed to be broken at the time it is made if the grantee has no title. (Emphasis added).
... .
A definition also employed by the courts is to the effect that a covenant of seisin is tantamount to the representation by the grantor that he is seised in fee of an indefeasible title to the property conveyed.
As stated in Bridges v. Heimburger, 360 So.2d 929, 930 (Miss. 1978), "The covenant of seizin and the covenant of power to sell (good right to convey) are an assurance that the grantor has the estate he purports to convey."
Furthermore, the Court in H. Weston Lumber Co. v. Lacey Lumber Co., 123 Miss. 208, 85 So. 193 (1920), found, "The covenant of seizin only extends to a title existing in a third person, which may defeat the estate granted by the covenantor." 123 Miss. at 216, 85 So. 195. (Emphasis added).
The covenants of seizin and power to sell were breached in the case sub judice. Again, these covenants are breached, if at all, when made if a third person has a title that may defeat that estate granted by the covenantor. We construe this language to mean exactly what it says  namely, that the covenants are breached when the deed is delivered, and a subsequent lawsuit confirming title in the grantee (in this case, Howard) has nothing to do with whether the covenants were breached or not.
The court below also based its decision in denying an award of attorney's fees on the case of Brooks v. Black, 68 Miss. 161, 8 So. 332 (1890), and the numerous decisions following that case. (Citations omitted)
In no way do we attempt to circumvent Brooks, supra, or its progeny, but merely find their factual situations distinguishable from this case.
In order to do justice to the rationale of this opinion, a brief discussion of Brooks, supra, is necessary. Brooks involved an action by a purchaser at a foreclosure sale against his remote vendor to recover, among other things, attorney's fees incurred in defending an ejectment action brought by parties claiming title paramount to that of the vendor. The theory of the action was that there had been a breach of warranty of title.
In discussing the measure of damages, the Court found that, "Regardless of the value of the land at the time of the eviction, the recovery is measured by the value of the land at the time of the conveyance, which value is conclusively fixed by the price paid by the vendee or received by the vendor." Id. at 167, 8 So. at 333.
The Court continued, and held that attorney's fees could not be recovered. The Court reasoned that since the measure of damages is the price paid by the vendee, an awardance of attorney's fees would extend those damages above and beyond the settled standard of damages.
With this we have no quarrel. However, in Brooks the covenantee was divested of his land while in the case sub judice Howard retained the title to his land. This factual distinction decides the case.
To hold that a covenantee is not entitled to attorney's fees in a case such as this would have the effect of dissolving the "power to sell" covenant, for what is the purpose of a covenant if, when breached, the covenantor is not held responsible for that breach?
We interpret Brooks v. Black, supra, to mean that attorney's fees may not be had when the maximum measure of damages *277 has been awarded to the covenantee. However, as in the case at bar, we hold that reasonable attorney's fees and other expenses may be awarded the covenantee, not to exceed the price paid by the covenantee when purchasing the land.
Furthermore, in viewing the matter in this light it matters not which of the five covenants are breached, except of course when remote covenantors are involved.
Accordingly, we find that Howard is entitled to reasonable attorney's fees in the amount of $2,414.30.

II.

WHETHER IT WAS ERROR TO TAKE JUDICIAL NOTICE THAT THE $20,000 PURCHASE PRICE WAS IN AN INTEREST BEARING ESCROW FUND
The lower court found that there was no proof regarding how the escrow funds were deposited. However, the court took judicial notice that the usual escrow practice is to put funds into an interest bearing account.
A trial judge must base his findings upon the evidence and testimony, and not upon his personal knowledge of the case. City of Jackson v. Lee, 234 Miss. 502, 106 So.2d 892 (1958). Thus, it was an abuse of discretion on the part of the lower court to take judicial notice of this fact.
However, Howard offered no proof showing that the funds had not been deposited in an interest-bearing escrow fund. All that was shown was that Sultan withheld the purchase price. Therefore, Howard is not entitled to the interest on the $20,000.00 purchase price, for he failed to meet his burden of proof.

III.

WHETHER THE LOWER COURT ERRED IN INTERRUPTING THE CROSS EXAMINATION OF CLANTON AND PERMITTING HIM TO PRIVATELY CONFER WITH HIS COUNSEL
During the cross-examination of Clanton, the court interrupted and allowed a private conference between Clanton and his counsel.
Mississippi recognizes the wide latitude given to a trial judge concerning the examination of witnesses. In Jackson Yellow Cab Co. v. Alexander, 246 Miss. 268, 148 So.2d 674 (1963), this Court stated,
The state and federal courts of this country have universally recognized that the trial judge has the authority to see to it that the examination of the witness is conducted in an orderly manner and a wide discretion is given him in controlling such examination. He may state wherein a line of examination is immaterial and restrict the examination, so long as he does not say anything calculated to influence the testimony of the witness or cause the jury to be prejudiced against one of the parties. See 53 Am.Jur., Trials, Sec. 75, p. 74; 3 Am.Jur., Appeal and Error, Sec. 1056, p. 606; Birmingham Ry. & Electric Company v. Ellard, 135 Ala. 433, 33 So. 276; Olson v. Solverson, 71 Wis. 663, 38 N.W. 329; Rankin v. Sharples, 206 Ill. 301, 69 N.E. 9.
Id. at 278-79, 148 So.2d 674.
While this was an abuse of discretion, we find no reversible error committed. However, one should recognize that by interrupting a cross-examination and allowing a witness to privately confer with his own counsel, an assignment of error on appeal will almost certainly be argued.
REVERSED AND RENDERED IN PART; AFFIRMED IN PART.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER and ANDERSON, JJ., concur.
ROBERTSON, J., dissents.
HAWKINS, J., not participating.
ROBERTSON, Justice, dissenting:
While there is much in the result reached by the majority I find palatable, there is little in the law which supports it. The *278 majority has cited no case here or in any other common law jurisdiction which supports the inescapable effect of the majority's holding: that henceforth the covenant of power to sell contains within it an implied covenant of merchantability of title. I suggest no such case may be found. Changes should be made in our law of real property only in cases of compelling necessity. This is not such a case.
Without any doubt, our law afforded Lexie Howard facilities for protecting himself against the eventuality which has transpired, only he failed to use them. First, Howard could have obtained a competent examination of title before he purchased from Clanton. If he had done so, he would have discovered the same problems Donald Sultan found.[1] Second, he could have refused to buy unless Clanton expressly warranted to him the merchantability of the title. He did neither.
I am confident that, back in 1975 when he purchased the land from Clanton, Howard had no desire to buy a lawsuit. He could easily have protected himself from such, insisting upon a contract of sale wherein Clanton would have covenanted to convey merchantable title. See Union and Planter's Bank & Trust Co. v. Corley, 161 Miss. 282, 312, 133 So. 232, 237-38 (1931); Nixon v. Franklin, 289 S.W.2d 82, 88 (Mo. 1956). Prudently, he should have insisted that the deed Clanton gave him include an express warranty of merchantability of title.[2] The majority nevertheless gives Howard the relief to which he would be entitled if he had utilized the facilities and opportunities which our law made available to him, but which he wholly ignored.
As the majority correctly notes, the use of the word "warrant" without restrictive words in an instrument of conveyance implies five covenants known to the common law. Miss. Code Ann. § 89-1-33 (1972). A covenant of merchantability of title has never been held, expressly or impliedly, in this jurisdiction or anywhere else in the common law world, among these five.
The majority finds that Clanton has breached one of those covenants  the covenant of power to sell.[3] All of the treatises on the subject opine that the covenant of power to sell (alternatively known as covenant of right to convey) and the covenant of seisin are for all practical purposes identical in content and scope. 6A Powell on Real Property pp. 896-97 (1984); 3 American Law Of Property § 12.127 (1952); 2 Devlin, Real Property and Deeds § 893 (3d Ed. 1911); Rawle, The Law Of Covenant For Title §§ 66-67 (5th ed. 1887).
The covenant of power to sell constitutes an affirmation of a legal status, in this instance ownership of fee simple title. The majority correctly notes that breach is universally regarded as having been shown where the grantor is proved, at the time he delivered the warranty deed, to have had less than the "very estate in quantity and quality which he has purported to convey". 7 Thompson On Real Property § 3178, p. 240 (1962). See Bridges v. Heimburger, 360 So.2d 929, 930 (Miss. 1978). Put otherwise, breach occurs where at the time of conveyance there is

*279 a title existing in a third person, which may defeat the estate granted by the convenantor. (Emphasis added).
H. Weston Lumber Co. v. Lacey Lumber Co., 123 Miss. 208, 216, 85 So. 193, 195 (1920).
The majority accords the word "may" in this statement a meaning other than what is there expressed. Obviously, anytime there is a pretender to title, the estate granted may be defeated, for the outcome of a lawsuit is never certain. Under the majority's approach any extant third party claim, no matter how insubstantial, results in breach of the covenant. The only workable approach to breach lies in requiring that the covenantee show that the estate granted has been defeated, not that it may be defeated.
All are agreed that the breach, if there be one, must be found in the facts as they existed at the moment Clanton delivered the warranty deed to Howard. To be sure, there were facts of record at that time which suggested that the Carpenter heirs had a claim to the property. Those facts, however, as they must now be seen, would suggest only the absence of a merchantable title in Clanton. The fact that the outcome of the chancery court lawsuit was not certain and that, indeed, there may have been in the record of that case evidence from which the chancery court could have ruled the other way would go only to the claim of breach of a covenant or warranty of merchantability, had there been one. These facts simply do not establish a breach of the covenant of seisin or power to sell (right to convey) or any other covenant in law or in fact given by Clanton to Howard.
Obviously, if in May of 1975, someone had held rights in the property superior to those of Clanton, a breach of the covenant would have occurred at the moment he delivered the deed to Howard. If the Carpenter heirs had been successful in the prior litigation  the effect of which would have been entry of a final decree thereby vesting them with title and canceling Clanton's claims  we would without question have violations by Clanton of the covenants of seisin and of power to sell which he extended to Howard.
What the majority overlooks is that there is a difference between the real property concept of fee simple title and the concept of merchantable title. Fee simple title refers to the entire bundle of rights in the property ownership of which is a legal status which ultimately may be established by litigation. One may have fee simple title and yet not merchantable title. To be merchantable,[4] a title must be one which as a practical matter "can be sold or mortgaged to a person of reasonable prudence". Jones v. Hickson, 204 Miss. 373, 396, 37 So.2d 625, 629 (1948); Union and Planter's Bank & Trust Co. v. Corley, 161 Miss. at 312, 133 So. at 237.
Without doubt, back in 1975 Clanton's title was not merchantable. The fact that a title is not merchantable, however, does not establish that it is bad or that there has been a breach of the covenant of seisin or power to sell (right to convey). 7 Thompson On Real Property, § 3180, p. 248 (1962).
If there has been no breach of the covenant, obviously there is no right of recovery of expenses incurred in making the title good. The inescapable effect of the outcome of the first suit is a judicial determination that, back in 1975 Clanton conveyed exactly that which he purported to convey to Howard  fee simple title. Clanton in no way purported to convey, or warranted that he was conveying, maerchantable title. Clanton warranted that he had and was conveying a title that could be successfully defended in the event of litigation. He did not warrant that the title would never have to be so defended.
The point was put in Presley v. Haynes, 182 Miss. 44, 180 So. 71 (1938), an analogous case involving a claim of breach of the covenant of warranty of title

*280 ... [A] warrantee cannot recover of the warrantor the expense of making the title good of record when it was already actually good by readily available and undisputed facts in pais.
182 Miss. at 50, 180 So. at 72.
True, the facts were not undisputed in 1975. The dispute then existing, however, has been laid to rest in that on July 23, 1982, the Chancery Court of Grenada County held and adjudged Donald Sultan to be the owner in fee simple by virtue of the warranty deed Sultan held from Lexie Howard. Howard's title, of course, was derived by virtue of the warranty deed executed by Haven Clanton in May of 1975. The effect of the Chancery Court decree of July 23, 1982, is that there was in May of 1975 no title existing in a third person sufficient to defeat the fee simple estate theretofore held and thereupon granted by Clanton. This being so, there can be no breach of the covenants of seizin and power to sell.
For these reasons, I respectfully dissent and would not reach any of the other issues discussed by the majority.
NOTES
[1] If Howard purchased with his eyes open, knowing of the problems with his title (I am not clear from the record whether this is the case), I do not know why we should relieve him of the risk he assumed.
[2] I say "prudently" in that all prior negotiations and contracts are ordinarily thought merged into the deed of conveyance. See West v. Arrington, 183 So.2d 824, 827 (Miss. 1966); but see, Phillips Petroleum Company v. Stack, 231 So.2d 475, 481-82 (Miss. 1970).
[3] The nature of the claim asserted by Howard would implicate the covenant of warranty of title (sometimes merely the "covenant of warranty") more logically than the two covenants discussed above, for it is covenant of warranty that is ordinarily thought of as obligating the grantor to defend against third party assaults against the title. Warranty, however, would afford Howard no relief for breach thereof occurs only upon disturbance of the covenantee's possession. See Wilder v. Wilhite, 190 Kan. 564, 376 P.2d 797, 799 (1962); Bolinger v. Brake, 57 Kan. 663, 669, 47 Pac. 537, 539 (1897). The same result obtains if one tries to fit Howard's claim within the related covenant of quiet enjoyment. Brown v. Lober, 75 Ill.2d 547, 27 Ill. Dec. 780, 785, 389 N.E.2d 1188, 1193 (1979).
[4] "merchantable" and "marketable" are used interchangeably by Justice Ethridge writing for the majority in Corley, 161 Miss. at 312, 133 So.2d at 237-38.