ROBERTS, J., for the Court.
 

 ¶ 1. This appeal centers on a discrepancy between language in a granting clause and what was termed as the “acquisition clause” of a quitclaim deed. The events that led to the necessity for and transfer of that quitclaim deed will be described in greater detail below. In any event, Central Healthcare Services, P.A. (CHS) executed a quitclaim deed, and pursuant to the granting clause of that quitclaim deed, CHS gave Wendall Harrell all of its interest in two portions of property. However, the acquisition clause of the quitclaim deed did not mention one of the two portions of property. As will be discussed, Citizens Bank of Philadelphia, Mississippi (the Bank) had an interest in both portions of property, and it filed suit to confirm its ownership of the portion that was not mentioned in the acquisition clause. CHS and Harrell denied that it transferred its ownership in the property at issue. Additionally, CHS and Harrell filed four counterclaims against the Bank.
 

 ¶ 2. After trial, the Leake County Chancery Court held that the language in the granting clause controlled over the language in the acquisition clause. Consequently, the chancellor held that the Bank owned both tracts mentioned in the granting clause. However, the chancellor declined to order CHS or Harrell to pay a deficiency amount, indemnification, or attorneys’ fees. The chancellor also denied all of CHS’s and Harrell’s counterclaims.
 

 ¶ 3. CHS and Harrell appeal. They claim that the chancellor erred when she found that the quitclaim deed transferred the property at issue. CHS and Harrell also argue that the chancellor erred when she denied their counterclaims. Finding no error, we affirm on direct appeal. The Bank cross-appeals and argues that the chancellor erred when she declined to award a judgment for the deficiency
 
 *1164
 
 amount, indemnification, or attorneys’ fees. After careful consideration, for reasons that will be expressed in greater detail below, we find that the chancellor erred when she denied the Bank’s request for attorneys’ fees and the Bank’s request for indemnification. Accordingly, we reverse and remand on cross-appeal.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶4. For some time prior to September 2000, Harrell had been acquiring piecemeal sections of property situated at the intersection of Highway 16 and Highway 35 in Leake County, Mississippi. Harrell’s goal was to compile those sections into a larger property and then develop a commercial shopping center on that property. The Bank had financed Harrell’s previous acquisitions.
 

 ¶ 5. In September 2000, the Bank loaned Harrell approximately $950,000. That figure represented the consolidation of Harrell’s previous loans. Harrell gave the Bank a deed of trust as collateral for the September 2000 loan. Sections of property described as “the Crawford lot” and “the Hardage lot” were included in the description of the property collateralized by that deed of trust.
 
 [1]
 
 Both the Crawford lot and the Hardage lot — then owned by CHS — were encumbered by debts prior to the September 2000 loan. Those outstanding debts were later satisfied by the proceeds of the September 2000 loan.
 

 ¶ 6. Harrell later defaulted on the September 2000 loan, and after extending Harrell’s loan payments, the Bank eventually foreclosed on the September 2000 deed of trust.
 
 [2]
 
 The Bank was the successful bidder at the foreclosure sale. The Bank then sold the property to an entity called “the Whitten Group.” However, the Whitten Group determined that Harrell did not own the title to the Crawford lot when he provided the Bank with the deed of trust.
 

 ¶ 7. Harrell’s attorney, Roy Wright, approached Gregory, the principal owner of CHS, regarding whether she would execute a quitclaim deed transferring CHS’s interest in the Crawford lot to the Whitten Group. Gregory agreed. Wright drafted the quitclaim deed and CHS executed it. However, there was a discrepancy in the quitclaim deed. The language in the granting clause contained descriptions of the Crawford lot and the Hardage lot. However, the drafting attorney included language that he termed as an “acquisition clause.”
 
 [3]
 
 The acquisition clause only described the Hardage lot. When confronted with the discrepancy, CHS refused to execute a deed to correct it. Instead, CHS claimed it never intended to convey the Crawford lot to the Whitten Group and that it never conveyed the Crawford lot to Harrell. Additionally, Harrell claimed he never had title to the Crawford lot.
 

 ¶8. In October 2004, the Bank filed a complaint to confirm its ownership of the Crawford lot and to remove the cloud on
 
 *1165
 
 the title to that property. The Bank initially named CHS as the sole defendant, but it later amended its complaint and added Harrell as a defendant. CHS and Harrell filed counterclaims against the Bank for abuse of process, malicious prosecution, defamation, and for damages as set forth by the Litigation Accountability Act of 1988. Miss.Code Ann. §§ 11 — 55— 1, -15 (Rev.2002). CHS and Harrell also requested $3,000,000 in punitive damages.
 

 ¶ 9. The parties went to trial over the course of two days in April 2006 and one day during October 2006. In March 2007, the chancellor rendered her opinion and final judgment. The chancellor found that the Whitten Group owned the title to the Crawford lot.
 
 [4]
 
 However, the chancellor declined to order CHS or Harrell to pay the Bank damages for the deficiency amount, indemnification, or attorneys’ fees. Additionally, the chancellor dismissed CHS’s and Harrell’s counterclaims and their request for attorneys’ fees.
 

 ¶ 10. CHS and Harrell appeal. They claim the chancellor erred when she: (1) found that the quitclaim deed conveyed CHS’s interest in the Crawford lot, (2) dismissed their counterclaims, and (3) declined to award them attorneys’ fees. The Bank cross-appeals and claims the chancellor erred when she: (1) declined to award it attorneys’ fees, (2) declined to award it a judgment for the deficiency amount, and (3) declined to award it a judgment to indemnify the Bank for the money it had paid the Whitten Group to repurchase the Crawford lot.
 

 STANDARD OF REVIEW
 

 ¶ 11. “This Court follows a limited standard of review when addressing appeals from a chancery court.”
 
 Kennedy v. Anderson,
 
 881 So.2d 340, 345(¶ 16) (Miss.Ct.App.2004). “We shall not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous, or there was an application by the chancellor of an erroneous legal standard.”
 
 Id.
 
 “Questions concerning construction of contracts are questions of law.”
 
 McMurphy v. Three Rivers Planning & Dev. Dist., Inc.,
 
 966 So.2d 192, 195(¶ 12) (Miss.Ct.App.2007). “We review questions of law pursuant to a de novo standard.”
 
 Id.
 

 ANALYSIS OF ISSUES ON DIRECT APPEAL
 

 I. OWNERSHIP OF THE TITLE TO THE CRAWFORD LOT
 

 ¶ 12. In this issue, CHS and Harrell claim the chancellor erred when she concluded that the quitclaim deed included CHS’s interest in the Crawford lot. According to CHS and Harrell, the chancellor should have awarded CHS title to the Crawford lot. We disagree.
 

 ¶ 13. This issue requires that we resolve a dispute in the construction of a quitclaim deed. Our purpose under the circumstances is to “ascertain and effectuate the parties’ intent.”
 
 Pursue Energy Corp. v. Perkins,
 
 558 So.2d 349, 351 (Miss.1990). To do so, we will first examine the language contained within the “four corners” of the quitclaim deed.
 
 Id.
 
 at 352. If the quitclaim deed is clear or unambiguous, our analysis ends.
 
 Id.
 

 ¶ 14. We cannot find that the quitclaim deed is clear or unambiguous. Surveyor James Townsend testified at trial. Townsend surveyed the property at issue after the Bank purchased it at the foreclosure
 
 *1166
 
 sale and then sold it to the Whitten Group. According to Townsend, the Crawford lot fell under the legal description in the granting clause of the 2004 quitclaim deed. However, Wright’s “acquisition clause” only mentioned the Hardage lot. Under the circumstances, we are directed to proceed to the next tier of the three-tiered process regarding resolution of such disputes. This next tier involves “implementation of applicable ‘canons’ of contract construction.”
 
 Id.
 

 ¶ 15. “[I]f the wording of the deed is ambiguous, the practical construction placed thereon by the parties will have much weight in determining the meaning.”
 
 Thornhill v. System Fuels, Inc.,
 
 523 So.2d 983, 990 (Miss.1988). “[Consideration of the totality of the circumstances attendant the devising of an instrument may help reveal the parties’ intent.”
 
 Pursue Energy,
 
 558 So.2d at 353. The circumstances and behavior of the parties in the case at bar after the original transactions clearly show that CHS — through Gregory- — intended for the quitclaim deed to transfer CHS’s interest in the Crawford lot.
 

 ¶ 16. Gregory originally acquired the Crawford lot from her father, Harrell. Gregory had an outstanding loan with the Bank. The Crawford lot was collateral for that loan. From 1995 through 1999, Gregory’s company, CHS, provided the Bank with financial reports. Those financial reports consistently listed the Crawford lot as an asset.
 

 ¶ 17. The Bank loaned Harrell $950,000 in September 2000. Harrell paid off CHS’s debt on the Crawford lot. Prior to that payment, Harrell had never paid any portion of CHS’s debt on the Crawford lot. Gregory did not list the Crawford lot as an asset in CHS’s 2000 financial report to the Bank. Gregory never again listed the Crawford lot as an asset.
 

 ¶ 18. Additionally, CHS did business out of a building situated on the Crawford lot. After September 2000, CHS vacated that building. Harrell subsequently demolished that building, re-graded the site, and made it indistinguishable from the rest of Harrell’s development property.
 

 ¶ 19. When the Bank initiated foreclosure proceedings in 2004, Harrell transferred all of the development property, including the Crawford lot, to a business entity called “Cotton Place Corporation.” Harrell’s attempt to transfer the Crawford lot suggests that Harrell believed he owned the Crawford lot. Additionally, the quitclaim deed was prepared solely to resolve the question regarding ownership of the Crawford lot, as ownership of the Hardage lot was not in question. Wright was the attorney who prepared the quitclaim deed. He testified that the purpose of the 2004 quitclaim deed was to clear up the title on the Crawford lot so the title could be transferred to the Whitten Group. Based on the totality of the circumstances, we must conclude that the parties executed the quitclaim deed to reflect Harrell’s ownership of the Crawford lot. Accordingly, we cannot find that the chancellor erred when she resolved this issue in the Bank’s favor. This issue is without merit.
 

 II. COUNTERCLAIMS BY HARRELL AND CHS
 

 A. ABUSE OF PROCESS
 

 ¶ 20. CHS and Harrell claim the chancellor erred when she declined to find the Bank liable for abuse of process. According to CHS and Harrell, the Bank filed its complaint solely and unjustifiably to force CHS to convey the Crawford lot. CHS and Harrell reason that the Bank is, therefore, liable for abuse of process. We disagree.
 

 
 *1167
 
 ¶ 21. A cause of action for abuse of process has been described as follows:
 

 [It] consists in the misuse or misapplication of a legal process to accomplish some purpose not warranted or commanded by the writ. It is the malicious perversion of a regularly issued civil or criminal process, for a purpose and to obtain a result not lawfully warranted or properly attainable thereby, and for which perversion an action will lie to recover the pecuniary loss sustained....
 

 Williamson v. Keith,
 
 786 So.2d 390, 393-94(¶ 12) (Miss.2001) (quoting
 
 State ex rel. Foster v. Turner,
 
 319 So.2d 233, 236 (Miss.1975)). “The elements of abuse of process are: (1) the party made an illegal use of the process, a use neither warranted nor authorized by the process, (2) the party had an ulterior motive, and (3) damage resulted from the perverted use of process.”
 
 Franklin Collection Serv., Inc. v. Stewart,
 
 863 So.2d 925, 931(¶ 18) (Miss.2003) (quoting
 
 McLain v. West Side Bone and Joint Ctr.,
 
 656 So.2d 119, 123 (Miss.1995)). According to the Mississippi Supreme Court, the “crucial element” of this cause of action is “the intent to abuse the privileges of the legal system.”
 
 Ayles v. Allen,
 
 907 So.2d 300, 303(¶ 10) (Miss.2005) (citing
 
 McLain,
 
 656 So.2d at 123).
 

 ¶ 22. We cannot find that the chancellor erred when she declined to find the Bank liable for abuse of process. There was no evidence that the Bank illegally used civil process. Likewise, there was no evidence that the Bank filed its complaint with an ulterior motive. The Bank’s sole motive appears to have been acquiring title to the Crawford lot. At the very least, there is no evidence that the Bank had any other motive. CHS and Harrell may have had the subjective personal opinion that the Bank’s suit was unwanted or burdensome to them, but that opinion — in and of itself — does not dictate the Bank’s motive in filing suit. It follows that the chancellor did not abuse her discretion when she declined to find the Bank liable of abuse of process. Accordingly, we find no merit to CHS’s and Harrell’s argument under this issue.
 

 B. MALICIOUS PROSECUTION
 

 ¶ 23. Next, CHS and Harrell claim the chancellor erred when she declined to find the Bank liable for malicious prosecution. “An action for abuse of process differs from an action for malicious prosecution in that the latter is concerned with maliciously causing process to issue, while the former is concerned with the improper use of process after it has been issued.”
 
 Moon v. Condere Corp.,
 
 690 So.2d 1191, 1197 (Miss.1997) (quoting
 
 Turner,
 
 319 So.2d at 236). The elements of a prima facie case of malicious prosecution are as follows:
 

 (1) the institution or continuation of original judicial proceedings, either criminal or civil;
 

 (2) by, or at the insistence of the defendants;
 

 (3) the termination of such proceeding in plaintiffs favor;
 

 (4) malice in instituting the proceeding;
 

 (5) want of probable cause for the proceedings; and
 

 (6) the suffering of injury or damages as a result of the action or prosecution.
 

 Richard v. Supervalu, Inc.,
 
 974 So.2d 944, 948-49(¶ 14) (Miss.Ct.App.2008). CHS and Harrell were obligated to prove each element by a preponderance of the evidence.
 
 Van v. Grand Casinos, Inc.,
 
 724 So.2d 889, 891(¶ 8) (Miss.1998).
 

 ¶ 24. We cannot find that the chancellor abused her discretion when she declined to find the Bank liable for malicious prosecution. The Bank’s original action to con
 
 *1168
 
 firm title did not terminate in CHS’s or Harrell’s favor. There was no evidence that the Bank had any malicious intent when it initiated its action to quiet title to the Crawford lot. Because CHS and Harrell failed to prove each element of a prima facie case of malicious prosecution by the preponderance of the evidence, we find no merit to this allegation.
 

 C. DEFAMATION
 

 ¶ 25. Next, CHS and Harrell argue that the chancellor erred when she declined to find the Bank liable for defamation. According to CHS and Harrell, the Bank defamed them when it filed its quiet title action. However, “[statements made in connection with judicial proceedings, including pleadings, are, if in any way relevant to the subject matter of the action, absolutely privileged and immune from attack as defamation, even if such statements are made maliciously and with knowledge of their falsehood.”
 
 McCorkle v. McCorkle,
 
 811 So.2d 258, 266(¶ 18) (Miss.Ct.App.2001). The Bank’s claims regarding its basis for its quiet title action were directly relevant to the subject matter of its lawsuit. Accordingly, though we do not find that the statements at issue were made maliciously or with knowledge of their falsehood, we must find that the statements at issue were privileged. It follows that we find no merit to this issue.
 

 D. LITIGATION ACCOUNTABILITY ACT
 

 ¶ 26. In their final issue under this heading, CHS and Harrell claim that the chancellor erred when she found that the Bank was not liable for damages pursuant to the Litigation Accountability Act of 1988 as set forth in Mississippi Code Annotated sections 11-55-1 through -15. Mississippi Code Annotated section 11-55-5(1) (Rev. 2002) provides in pertinent part that:
 

 the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney’s fees and costs against any party or attorney if the court, upon the motion of any party or on its own motion, finds that an attorney or party brought an action, or asserted any claim or defense, that is without substantial justification, or that the action, or any claim or defense asserted, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceedings by other improper conduct including, but not limited to, abuse of discovery procedures available under the Mississippi Rules of Civil Procedure.
 

 ¶ 27. A claim is without substantial justification when it is “frivolous, groundless in fact or in law, or vexatious, as determined by the court.” Miss.Code Ann. § ll-55-3(a) (Rev.2002). To determine whether a claim is frivolous, this Court looks to the definition of “frivolous” as set forth in Rule 11 of the Mississippi Rules of Civil Procedure.
 
 Leaf River Forest Prods., Inc. v. Deakle,
 
 661 So.2d 188, 197 (Miss.1995). In the context of Rule 11, a claim is frivolous “only when, objectively speaking, the pleader or movant has no hope of success.”
 
 Stevens v. Lake,
 
 615 So.2d 1177, 1184 (Miss.1993).
 

 ¶ 28. Once again, we cannot find that the chancellor erred when she declined to order the Bank to páy CHS and Harrell damages for a violation of the Litigation Accountability Act. The Bank’s initial action was not frivolous. Accordingly, CHS and Harrell were not entitled to an award pursuant to the Litigation Accountability Act. It follows that we find no merit to this allegation.
 

 III. ATTORNEYS’FEES
 

 ¶ 29. In their final issue, CHS and Harrell claim the chancellor erred when she
 
 *1169
 
 declined to order the Bank to pay CHS’s and Harrell’s attorneys’ fees. CHS’s and Harrell’s argument for attorneys’ fees is based largely on the concept that the Bank was liable for abuse of process, defamation, malicious prosecution, or damages pursuant to the Litigation Accountability Act of 1988. We have found no merit to CHS’s and Harrell’s arguments under those issues. Accordingly, we find no error in the chancellor’s decision to deny CHS’s and Harrell’s claims for attorneys’ fees.
 

 ANALYSIS OF ISSUES ON CROSS-APPEAL
 

 I. ATTORNEYS’FEES
 

 ¶ 30. In its initial and amended complaints, the Bank requested attorneys’ fees. The Bank concedes that it did not offer any proof regarding attorneys’ fees during its case-in-chief. However, the Bank moved the Court to reopen the proof to allow the Bank to put on proof of its attorneys’ fees. The chancellor granted the Bank’s request, and the Bank put on its proof. That decision is not challenged on appeal.
 

 ¶ 31. However, the chancellor ultimately decided not to order CHS or Harrell to pay the Bank’s attorneys’ fees. According to the chancellor, the Bank was not entitled to attorneys’ fees because attorneys’ fees were precluded by this Court’s decision in
 
 White v. Usry,
 
 800 So.2d 125, 134(¶ 41) (Miss.Ct.App.2001), in which this Court held that a chancellor had no authority to award attorneys’ fees incident to a suit to confirm title and to remove a cloud on a title. The Bank claims the chancellor erred.
 

 ¶ 32. The Bank argues that its suit was more than a suit to confirm title and to remove a cloud on a title. Although it did not raise claims for breach of warranty or breach of contract in its initial complaint, the Bank raised those claims in its amended complaint. The Bank further notes that the chancellor expressly found that Harrell had breached the express warranty of title provided by the September 2000 deed of trust.
 
 [5]
 
 The chancellor also found that “Harrell breached his contract with the Bank when he failed to pay the balance due on the promissory note after receipt of written demand for the same.” The Bank cites
 
 Howard v. Clanton,
 
 481 So.2d 272, 276-77 (Miss.1985) in which the Mississippi Supreme Court held that attorneys’ fees may be recoverable where there has been a breach of a warranty deed and the purchaser was not divested of the land while adjudicating title.
 

 ¶ 33. Because the chancellor found that Harrell breached the express warranty of title as provided by the September 2000 deed of trust, and our precedent allows recovery of attorneys’ fees incident to such a claim, we must conclude that the chancellor erred when she held that the Bank could not recover attorneys’ fees. The Bank’s suit was more than an action to quiet and confirm title. We cannot ignore the chancellor’s finding that Harrell breached the express warranty of title. However, this Court is a reviewing court, and we are not situated to act as a fact-finder under these circumstances. We have merely found that the Bank is not precluded from recovering attorneys’ fees. We have not necessarily found that the Bank is
 
 entitled
 
 to such fees. Accordingly, although the Bank has put forth proof of its attorneys’ fees, we must remand this matter to the chancery court for a hearing regarding whether Harrell should be re
 
 *1170
 
 sponsible for the Bank’s attorneys’ fees based on the chancellor’s findings that Harrell committed a breach of contract and a breach of the express warranty of title and, if so, the appropriate amount of those fees.
 

 II. DEFICIENCY AMOUNT
 

 ¶ 34. The loan agreement between the Bank and Harrell provided that, in the event that Harrell defaulted on the loan, the Bank had the right to “obtain a deficiency judgment if the proceeds do not satisfy the debt.” The Bank claimed it was entitled to a deficiency judgment of $81,611.03. The chancellor declined to order Harrell to pay the Bank a deficiency judgment because the property had been appraised at more than $1,715,000 and the difference between the sale price and the appraised price was approximately $750,000. Therefore, there was sufficient equity in the land to satisfy the debt. The Bank claims the chancellor erred. We disagree.
 

 ¶ 35. Mississippi Code Annotated section 11-5-111 (Rev.2002) provides as follows:
 

 Upon the confirmation of the report of sale of any property, real or personal, under a decree for sale to satisfy a mortgage, deed of trust, or other lien on such property, if there be a balance due to the complainant, the court, upon motion, shall give a decree against the defendant for any such balance for which by the record of the case he may be personally liable, upon which decree execution may issue.
 

 A “mortgagee’s right to a deficiency decree is not absolute.”
 
 Lake Hillsdale Estates, Inc. v. Galloway,
 
 473 So.2d 461, 466 (Miss.1985). “The mortgagee’s right to a deficiency decree usually depends on the facts and circumstances of each case, and, since the mortgaged premises constitute the primary fund for the payment of the mortgage debt, it is only where the mortgagee has endeavored to collect it out of the land that a just judgment for deficiency can be entered.”
 
 Id.
 
 In other words, “something more than a difference between the price paid at the foreclosure and the amount of the indebtedness must be demonstrated before the mortgagee is entitled to a deficiency judgment.”
 
 Id.
 

 ¶ 36. In
 
 Galloway,
 
 the Mississippi Supreme Court could not “conclude that the value of the property thereby obtained is insufficient to satisfy the indebtedness of the mortgagor.”
 
 Id.
 
 Consequently, the supreme court held that the trial court in
 
 Galloway
 
 prematurely granted a deficiency judgment upon a motion for a directed verdict.
 
 Id.
 
 The supreme court reversed the trial court and remanded for a new hearing “to first determine if the mortgagee has endeavored to collect the indebtedness out of the land.”
 
 Id.
 
 Assuming the mortgagee satisfied the first question, the supreme court directed the trial court, upon remand, to determine “whether the value of the property satisfies the debt of the mortgagor or creates a surplus.”
 
 Id.
 

 ¶37. The Bank claims that, despite the positive difference between the debt and the appraised value, it is nonetheless entitled to a deficiency judgment. The Bank’s reasoning is based on the fact that the Whitten Group purchased the property for no more than what the Bank paid at the foreclosure sale. However, as the chancellor noted, there was no evidence that the Bank sought to include the deficiency amount in the purchase price when it sold the property to the Whitten Group. To be clear, this opinion should not be construed as a finding that a deficiency judgment is only recoverable when a seller satisfies a prerequisite of demonstrating an attempt to recover a deficient amount. Instead, we merely find that,
 
 *1171
 
 under the precise circumstances of this case, we cannot find that the chancellor abused her discretion when she declined to award a deficiency judgment. This issue lacks merit.
 

 III. AMOUNT PAID TO REPURCHASE THE CRAWFORD LOT
 

 ¶ 38. After the Whitten Group purchased the property at issue and discovered the cloud on its title to the Crawford lot, the Whitten Group demanded that the Bank resolve the matter. The Bank repurchased an acre of property that included the Crawford lot, the Hardage lot, and a small.parcel of property that adjoined the two lots. Although the property had been appraised for $230,000, the Bank paid $264,000 for it. In its amended complaint, the Bank requested that the chancellor order Harrell to pay the $34,000 difference between the appraised price and the purchase price as indemnification to the Bank. However, the chancellor declined the Bank’s request. To be precise, the chancellor found as follows:
 

 The settlement paid by the Bank was voluntary, and under current Mississippi law, an indemnitee such as the Bank cannot simply settle, and then send the indemnitor his share of the bill. It must, in the words of our rule, prove that it paid under compulsion. The evidence showed that the Bank settled simply because there was a potential for liability arising from a breach of warranty-
 

 The Bank claims the chancellor erred. We agree.
 

 ¶ 39. “An obligation to indemnify may arise from a contractual relation, from an implied contractual relation, or out of liability imposed by law.”
 
 Hartford Cas. Ins. Co. v. Halliburton Co.,
 
 826 So.2d 1206, 1216(¶ 34) (Miss.2001). We can find no direct contractual obligation to indemnify on Harrell’s part. However, as mentioned above, the chancellor found that Harrell breached the express warranty of title that he tendered to the Bank. It follows that there was at least an implied contractual obligation to indemnify the Bank for any damages that might result from the Bank’s sale of the property after the foreclosure sale.
 

 ¶ 40. There are two “critical” prerequisites of a noncontractual implied indemnification obligation.
 
 Id.
 
 at (¶ 35). Those two prerequisites are: (1) that the damages a claimant seeks are imposed due to a legal obligation to the injured person, and (2) “[i]t must appear that the claimant did not actively or affirmatively participate in the wrong.”
 
 Id.
 
 As for the first prerequisite, the Bank definitely had a legal obligation to give the Whitten Group a clear title to the property it sold. As for the second prerequisite, we have found no evidence that the Bank “actively” participated in placing a cloud on the title to the Whitten Group. The Bank had a justifiable reason to believe that it had a clear title to the Crawford lot when it purchased the property at issue during the foreclosure sale. Harrell’s attorney, Wright, prepared a certificate of title and mistakenly stated that Harrell owned the title to the Crawford lot free from any encumbrances. Because the Bank satisfied the two prerequisites of an implied indemnification obligation and is not precluded from recovery, we may now consider whether the Bank demonstrated the elements of its claim.
 

 ¶ 41. To prevail on an indemnity claim, the Bank was obligated to prove that: “(1) it was legally liable to an injured third party, (2) it paid under compulsion, and (3) the amount it paid was reasonable.”
 
 Id.
 
 at (¶ 36). Without question, the Bank was legally liable to the Whitten Group. The Bank sold the Whitten Group property
 
 *1172
 
 that the Bank did not actually own. The record does not contain any discussion of the third element, whether the amount paid was reasonable. However, under the circumstances, our resolution turns on the second element: whether the Bank paid under compulsion. The chancellor found that the Bank did not pay under compulsion because there was merely a
 
 potential
 
 for liability due to the Bank’s breach of warranty. Although we are mindful of the deferential standard of review, we must conclude that the chancellor erred.
 

 ¶ 42. “To constitute ‘compulsion’ ... rendering payment involuntary, there must be some actual or threatened exercise of power possessed, or supposedly possessed, by payee over payer’s person or property, from which payer has no means of immediate relief except by advancing money.” Black’s Law Dictionary 287 (6th ed.1990). The chancellor correctly stated the law in that one who seeks indemnity “cannot recover under this legal principle on the theory that [he] might have been liable to those with whom [he] settled if [he] had not settled with them.”
 
 Hartford Cas. Ins. Co.,
 
 826 So.2d at 1216-17(¶ 37). The Bank could not “simply settle, and then send the indemnitor his share of the bill.”
 
 Id.
 
 at 1217(¶ 38).
 

 ¶43. However, the law is also clear that the Bank was not obligated to litigate the matter as a prerequisite to indemnification.
 
 Id.
 
 The Bank “was entitled to use its own good judgment and effect [a] settlement of the ... claim.”
 
 Id.
 
 The Bank has never described its liability as “potential” as characterized by the chancellor. While the Bank’s liability may be characterized as “potential” in that it had not been adjudicated when settled, the Bank never denied that it was liable for breaching its express warranty of title as provided to the Whitten Group. Because the Bank would not have breached its warranty had Harrell not breached his own express warranty of title, we must find that the Bank was not precluded from obtaining a judgment for indemnification.
 

 ¶ 44. Be that as it may, we do not render a judgment for the Bank. Instead, because we are not suited to act as a fact-finder, we must remand this matter to the chancery court for a determination as to whether the amount paid was reasonable. If so, only then may the chancellor order Harrell to indemnify the Bank. Accordingly, we reverse the chancellor’s judgment incident to this issue and remand this matter to the chancellor for proceedings consistent with this opinion.
 

 ¶ 45. THE JUDGMENT OF THE LEAKE COUNTY CHANCERY COURT IS AFFIRMED ON DIRECT APPEAL AND, ON CROSS-APPEAL, AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANTS/CROSS-APPELLEES AND THE APPELLEE/CROSS-APPEL-LANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Harrell’s attorney provided the Bank with a preliminary certificate of title. The preliminary certificate of title indicated that Harrell would acquire the title to the Hardage lot, which was owned by CHS. Harrell's daughter, Blanche Gregory, was the sole owner of CHS.
 

 [2]
 

 . During the foreclosure proceedings, Harrell conveyed what the Bank terms "the entire series of parcels, including the Crawford lot" to what the Bank calls a “straw man” entity. That entity immediately declared bankruptcy. The Bank acquired an order from the bankruptcy court allowing the foreclosure proceedings to continue.
 

 [3]
 

 .For purposes of this opinion, we borrow the drafting attorney's description of the language at issue.
 

 [4]
 

 . The chancellor's decision amounted to a finding that the Bank owned the title to the property because the Bank had repurchased the Crawford lot from the Whitten Group after the Whitten Group discovered the defect in its title to the Crawford lot.
 

 [5]
 

 . According to the chancellor, “[Harrell] breached the express warranty of title given in the [d]eed of [t]rust dated September 14, 2000.”